**THREE BOYS MUSIC CORPORA-TION, Plaintiff–Appellee,**

**v.**

Michael BOLTON, individually and d/b/a Mr. Bolton's Music, Inc.; Andrew Goldmark; Non–Pareil Music, Inc.; Warner–Chappell Music Limited; Warner–Tamerlane Publishing Corp.; WB Music Corp.; and Sony Music Entertainment, Inc., Defendants–Appellants.

Nos. 97–55150, 97–55154

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 1999

Filed May 9, 2000

Robert G. Sugarman, Weil, Gotshal & Manges, New York, New York, for the defendants-appellants.

Russell J. Frackman, Mitchell, Silberberg & Knupp, Los Angeles, California, for the defendant-appellant.

Pierce O'Donnell, O'Donnell & Shaeffer, Los Angeles, California, for the plaintiff-appellee.

John P. McNicholas, McNicholas & McNicholas, Los Angeles, California, for the plaintiff-appellee.

Louis Petrich, Leopold, Petrich, & Smith, Los Angeles, California, for amici, Recording Industry Association of America, Inc. and Motion Picture Association of America, Inc.

Before: FLETCHER, D. W. NELSON, and BRUNETTI, Circuit Judges.

D.W. NELSON, Circuit Judge:

In 1994, a jury found that Michael Bolton's 1991 pop hit, "Love Is a Wonderful Thing," infringed on the copyright of a 1964 Isley Brothers' song of the same name. The district court denied Bolton's motion for a new trial and affirmed the jury's award of $5.4 million.

Bolton, his co-author, Andrew Goldmark, and their record companies ("Sony Music") appeal, arguing that the district court erred in finding that: (1) sufficient evidence supported the jury's finding that the appellants had access to the Isley Brothers' song; (2) sufficient evidence supported the jury's finding that the songs were substantially similar; (3) subject matter jurisdiction existed based on the Isley Brothers registering a complete copy of the song; (4) sufficient evidence supported the jury's attribution of profits to the infringing elements of the song; (5) Sony Music could not deduct its tax liability; and (6) the appellants' motion for a new trial based on newly discovered evidence was unwarranted.

We affirm.

## I. BACKGROUND

The Isley Brothers, one of this country's most well-known rhythm and blues groups, have been inducted into the Rock and Roll Hall of Fame. They helped define the soul sound of the 1960s with songs such as "Shout," "Twist and Shout," and "This Old Heart of Mine," and they mastered the funky beats of the 1970s with songs such as "Who's That Lady," "Fight the Power," and "It's Your Thing." In 1964, the Isley Brothers wrote and recorded "Love is a Wonderful Thing" for United Artists. The Isley Brothers received a copyright for "Love is a Wonderful Thing" from the Register of Copyrights on February 6, 1964. The following year, they switched to the famous Motown label and had three top–100 hits including "This Old Heart of Mine."

Hoping to benefit from the Isley Brothers' Motown success, United Artists released "Love is a Wonderful Thing" in 1966. The song was not released on an album, only on a 45–record as a single. Several industry publications predicted that "Love is a Wonderful Thing" would be a hit—"Cash Box" on August 27, 1966, "Gavin Report" on August 26, 1966, and "Billboard" on September 10, 1966. On September 17, 1966, Billboard listed "Love is a Wonderful Thing" at number 110 in a chart titled "Bubbling Under the Hot 100." The song was never listed on any other Top 100 charts. In 1991, the Isley Brothers' "Love is a Wonderful Thing" was re-

leased on compact disc. *See* Isley Brothers, *The Isley Brothers—The Complete UA Sessions*, (EMI 1991).

Michael Bolton is a singer/songwriter who gained popularity in the late 1980s and early 1990s by reviving the soul sound of the 1960s. Bolton has orchestrated this soul-music revival in part by covering old songs such as Percy Sledge's "When a Man Love a Woman" and Otis Redding's "(Sittin' on the) Dock of the Bay." Bolton also has written his own hit songs. In early 1990, Bolton and Goldmark wrote a song called "Love Is a Wonderful Thing." Bolton released it as a single in April 1991, and as part of Bolton's album, "Time, Love and Tenderness." Bolton's "Love Is a Wonderful Thing" finished 1991 at number 49 on Billboard's year-end pop chart.

On February 24, 1992, Three Boys Music Corporation filed a copyright infringement action for damages against the appellants under 17 U.S.C. §§ 101 *et seq.* (1988). The parties agreed to a trifurcated trial. On April 25, 1994, in the first phase, the jury determined that the appellants had infringed the Isley Brothers' copyright. At the end of second phase five days later, the jury decided that Bolton's "Love Is a Wonderful Thing" accounted for 28 percent of the profits from "Time, Love and Tenderness." The jury also found that 66 percent of the profits from commercial uses of the song could be attributed to the inclusion of infringing elements. On May 9, 1994, the district court entered judgment in favor of the Isley Brothers based on the first two phases.

The deadline for post-trial motions was May 25, 1994. On that day, the appellants filed a motion for judgment as a matter of law and a motion for new trial. The district court denied the motions on August 11, 1994. On June 8, 1994, the appellants filed a second motion for new trial based on newly discovered evidence on the issue of copyright ownership. The district court dismissed this motion as untimely.

On December 5, 1996, the district court adopted the findings of the Special Master's Amended Report about the allocation of damages (third phase). In the final judgment entered against the appellants, the district court ordered Sony Music to pay $4,218,838; Bolton to pay $932,924; Goldmark to pay $220,785; and their music publishing companies to pay $75,900. They timely appealed.

## II. DISCUSSION

■ Proof of copyright infringement is often highly circumstantial, particularly in cases involving music. A copyright plaintiff must prove (1) ownership of the copyright; and (2) infringement—that the defendant copied protected elements of the plaintiff's work. *See Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir.1996) (citation omitted). Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had "access" to the plaintiff's work and that the two works are "substantially similar." *Id.*

Given the difficulty of proving access and substantial similarity, appellate courts have been reluctant to reverse jury verdicts in music cases. *See, e.g., id.* at 1221 (affirming a jury's verdict for the defendants in a copyright infringement case involving Michael Jackson and other musicians); *Gaste v. Kaiserman*, 863 F.2d 1061, 1071 (2d Cir.1988) (affirming a jury's damages award against a defendant in a music copyright infringement case). Judge Newman's opinion in *Gaste* nicely articulated the proper role for an appeals court in reviewing a jury verdict:

> The guiding principle in deciding whether to overturn a jury verdict for insufficiency of the evidence is whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.

*Id.* at 1066 (internal quotations omitted). In *Arnstein v. Porter*, the seminal case

about musical copyright infringement, Judge Jerome Frank wrote:

> Each of these two issues—copying and improper appropriation—is an issue of fact. If there is a trial, the conclusions on those issues of the trier of the facts— of the judge if he sat without a jury, or of the jury if there was a jury trial— bind this court on appeal, provided the evidence supports those findings, regardless of whether we would ourselves have reached the same conclusions.

*Arnstein v. Porter,* 154 F.2d 464, 469 (2d Cir.1946).

■■■ As a general matter, the standard for reviewing jury verdicts is whether they are supported by "substantial evidence"—that is, such relevant evidence as reasonable minds might accept as adequate to support a conclusion. *See Poppell v. City of San Diego,* 149 F.3d 951, 962 (9th Cir.1998). The credibility of witnesses is an issue for the jury and is generally not subject to appellate review. *See Gilbrook v. City of Westminster,* 177 F.3d 839, 856 (9th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 614, 145 L.Ed.2d 509 (1999).

We affirm the jury's verdict in this case in light of the standard of review and copyright law's "guiding principles." Although we will address each of the appellant's arguments in turn, we focus on access because it is the most difficult issue in this case. Our decision is predicated on judicial deference—finding that the law has been properly applied in this case, viewing the facts most favorably to the appellees, and not substituting our judgment for that of the jury.

### A. *Access*

■■■ Proof of access requires "an opportunity to view or to copy plaintiff's work." *Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1172 (9th Cir.1977). This is often described as providing a "reasonable opportunity" or "reasonable possibility" of viewing the plaintiff's work. 4 Melville B.

Nimmer & David Nimmer, *Nimmer on Copyright,* § 13.02[A], at 13–19 (1999); *Jason v. Fonda,* 526 F.Supp. 774, 775 (C.D.Cal.1981), *aff'd,* 698 F.2d 966 (9th Cir. 1982). We have defined reasonable access as "more than a 'bare possibility.' " *Jason,* 698 F.2d at 967. Nimmer has elaborated on our definition: "Of course, reasonable opportunity as here used, does not encompass any bare possibility in the sense that anything is possible. Access may not be inferred through mere speculation or conjecture. There must be a reasonable possibility of viewing the plaintiff's work—not a bare possibility." 4 Nimmer, § 13.02[A], at 13–19. "At times, distinguishing a 'bare' possibility from a 'reasonable' possibility will present a close question." *Id.* at 13–20.

■■■ Circumstantial evidence of reasonable access is proven in one of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated. *See* 4 Nimmer, § 13.02[A], at 13–20–13–21; 2 Paul Goldstein, *Copyright: Principles, Law, and Practice* § 8.3.1.1., at 90–91 (1989). Goldstein remarks that in music cases the "typically more successful route to proving access requires the plaintiff to show that its work was widely disseminated through sales of sheet music, records, and radio performances." 2 Goldstein, § 8.3.1.1, at 91. Nimmer, however, cautioned that "[c]oncrete cases will pose difficult judgments as to where along the access spectrum a given exploitation falls." 4 Nimmer, § 13.02[A], at 13–22.

Proof of widespread dissemination is sometimes accompanied by a theory that copyright infringement of a popular song was subconscious. Subconscious copying has been accepted since Learned Hand embraced it in a 1924 music infringement case: "Everything registers somewhere in our memories, and no one can tell what

may evoke it.... Once it appears that another has in fact used the copyright as the source of this production, he has invaded the author's rights. It is no excuse that in so doing his memory has played him a trick." *Fred Fisher, Inc. v. Dillingham,* 298 F. 145, 147–48 (S.D.N.Y.1924). In *Fred Fisher,* Judge Hand found that the similarities between the songs "amount[ed] to identity" and that the infringement had occurred "probably unconsciously, what he had certainly often heard only a short time before." *Id.* at 147.

In modern cases, however, the theory of subconscious copying has been applied to songs that are more remote in time. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.,* 722 F.2d 988 (2d Cir.1983) is the most prominent example. In *ABKCO,* the Second Circuit affirmed a jury's verdict that former Beatle George Harrison, in writing the song "My Sweet Lord," subconsciously copied The Chiffons' "He's So Fine," which was released six years earlier. *See id.* at 997, 999. Harrison admitted hearing "He's So Fine" in 1963, when it was number one on the Billboard charts in the United States for five weeks and one of the top 30 hits in England for seven weeks. *See id.* at 998. The court found: "the evidence, standing alone, 'by no means compels the conclusion that there was access ... it does not compel the conclusion that there was not.'" *Id.* (quoting *Heim v. Universal Pictures Co.,* 154 F.2d 480, 487 (2d Cir.1946)). In *ABKCO,* however, the court found that "the similarity was so striking and where access was found, the remoteness of that access provides no basis for reversal." *Id.* Furthermore, "the mere lapse of a considerable period of time between the moment of access and the creation of defendant's work does not preclude a finding of copying." 4 Nimmer, § 13.02[A], at 13–20 (citing *ABKCO,* 722 F.2d at 997–98).

The Isley Brothers' access argument was based on a theory of widespread dissemination and subconscious copying. They presented evidence supporting four principal ways that Bolton and Goldmark could have had access to the Isley Brothers' "Love is a Wonderful Thing":

(1) Bolton grew up listening to groups such as the Isley Brothers and singing their songs. In 1966, Bolton and Goldmark were 13 and 15, respectively, growing up in Connecticut. Bolton testified that he had been listening to rhythm and blues music by black singers since he was 10 or 11, "appreciated a lot of Black singers," and as a youth was the lead singer in a band that performed "covers" of popular songs by black singers. Bolton also testified that his brother had a "pretty good record collection."

(2) Three disk jockeys testified that the Isley Brothers' song was widely disseminated on radio and television stations where Bolton and Goldmark grew up. First, Jerry Blavitt testified that the Isley Brothers' "Love is a Wonderful Thing" was played five or six times during a 13–week period on the television show, "The Discophonic Scene," which he said aired in Philadelphia, New York, and Hartford–New Haven. Blavitt also testified that he played the song two to three times a week as a disk jockey in Philadelphia and that the station is still playing the song today. Second, Earl Rodney Jones testified that he played the song a minimum of four times a day during an eight to 14 to 24 week period on WVON radio in Chicago, and that the station is still playing the song today. Finally, Jerry Bledsoe testified that he played the song on WUFO radio in Buffalo, and WWRL radio in New York was playing the song in New York in 1967 when he went there. Bledsoe also testified that he played the song twice on a television show, "Soul," which aired in New York and probably in New Haven, Connecticut, where Bolton lived.

(3) Bolton confessed to being a huge fan of the Isley Brothers and a collector of their music. Ronald Isley testified that when Bolton saw Isley at the Lou Rawls United Negro College Fund Benefit concert in 1988, Bolton said, "I know this guy.

I go back with him. I have all his stuff." Angela Winbush, Isley's wife, testified about that meeting that Bolton said, "This man needs no introduction. I know everything he's done."

(4) Bolton wondered if he and Goldmark were copying a song by another famous soul singer. Bolton produced a work tape attempting to show that he and Goldmark independently created their version of "Love Is a Wonderful Thing." On that tape of their recording session, Bolton asked Goldmark if the song they were composing was Marvin Gaye's "Some Kind of Wonderful."[1] The district court, in affirming the jury's verdict, wrote about Bolton's Marvin Gaye remark:

> This statement suggests that Bolton was contemplating the possibility that the work he and Goldmark were creating, or at least a portion of it, belonged to someone else, but that Bolton wasn't sure who it belonged to. A reasonable jury can infer that Bolton mistakenly attributed the work to Marvin Gaye, when in reality Bolton was subconsciously drawing on Plaintiff's song.

The appellants contend that the Isley Brothers' theory of access amounts to a "twenty-five-years-after-the-fact-subconscious copying claim." Indeed, this is a more attenuated case of reasonable access and subconscious copying than *ABKCO*. In this case, the appellants never admitted hearing the Isley Brothers' "Love is a Wonderful Thing." That song never topped the Billboard charts or even made the top 100 for a single week. The song was not released on an album or compact disc until 1991, a year after Bolton and Goldmark wrote their song. Nor did the Isley Brothers ever claim that Bolton's and Goldmark's song is so "strikingly similar" to the Isley Brothers' that proof of access is presumed and need not be proven.

Despite the weaknesses of the Isley Brothers' theory of reasonable access, the appellants had a full opportunity to present their case to the jury. Three rhythm and blues experts (including legendary Motown songwriter Lamont Dozier of Holland–Dozier–Holland fame) testified that they never heard of the Isley Brothers' "Love is a Wonderful Thing." Furthermore, Bolton produced copies of "TV Guide" from 1966 suggesting that the television shows playing the song never aired in Connecticut. Bolton also pointed out that 129 songs called "Love is a Wonderful Thing" are registered with the Copyright Office, 85 of them before 1964.

The Isley Brothers' reasonable access arguments are not without merit. Teenagers are generally avid music listeners. It is entirely plausible that two Connecticut teenagers obsessed with rhythm and blues music could remember an Isley Brothers' song that was played on the radio and television for a few weeks, and subconsciously copy it twenty years later. Furthermore, Ronald Isley testified that when they met, Bolton said, "I have all his stuff." Finally, as the district court pointed out, Bolton's remark about Marvin Gaye and "Some Kind of Wonderful" indicates that Bolton believed he may have been copying someone else's song.

Finally, with regard to access, we are mindful of Judge Frank's words of caution in *Arnstein v. Porter*: "The judge characterized plaintiff's story as 'fantastic'; and in the light of the references in his opinion to defendant's deposition, the judge obviously accepted the defendant's denial of access and copying.... [Y]et plaintiff's credibility, even as to those improbabilities, should be left to the jury." *Arnstein*, 154 F.2d at 469. In this case, Judge Baird heeded Judge Frank's admonition:

> [T]his Court is not in a position to find that the only conclusion that a reasonable jury could have reached is that

1. Marvin Gaye also referred to the song's chorus, "She's some kind of wonderful," in his song, "Too Busy Thinking About My

Baby." *See* Marvin Gaye, *Too Busy Thinking About My Baby, on MPG,* (Motown 1969).

Defendants did not have access to Plaintiff's song. One must remember that the issue this Court must address is not whether Plaintiff has proven access by a preponderance of evidence, but whether *reasonable minds* could find that Defendants had a *reasonable opportunity* to have heard Plaintiff's song before they created their own song.

Although we might not reach the same conclusion as the jury regarding access, we find that the jury's conclusion about access is supported by substantial evidence. We are not establishing a new standard for access in copyright cases; we are merely saying that we will not disturb the jury's factual and credibility determinations on this issue.

### B. *Substantial Similarity*

■ Under our case law, substantial similarity is inextricably linked to the issue of access. In what is known as the "inverse ratio rule," we "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Smith,* 84 F.3d at 1218 (citing *Shaw v. Lindheim,* 919 F.2d 1353, 1361–62 (9th Cir.1990); *Krofft,* 562 F.2d at 1172). Furthermore, in the absence of any proof of access, a copyright plaintiff can still make out a case of infringement by showing that the songs were "strikingly similar." *See Smith,* 84 F.3d at 1220; *Baxter v. MCA, Inc.,* 812 F.2d 421, 423, 424 n. 2 (9th Cir.1987).

■ Proof of the substantial similarity is satisfied by a two-part test of extrinsic similarity and intrinsic similarity. *See Krofft,* 562 F.2d at 1164. Initially, the extrinsic test requires that the plaintiff identify concrete elements based on objective criteria. *See Smith,* 84 F.3d at 1218; *Shaw,* 919 F.2d at 1356. The extrinsic test often requires analytical dissection of a work and expert testimony. *See Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1442 (9th Cir.1994). Once the extrinsic test is satisfied, the factfinder applies the intrinsic test. The intrinsic test is

subjective and asks "whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar." *Pasillas v. McDonald's Corp.,* 927 F.2d 440, 442 (9th Cir.1991) (internal quotations omitted).

■ We will not second-guess the jury's application of the intrinsic test. *See Krofft* 562 F.2d at 1166 ("Since the intrinsic test for expression is uniquely suited for determination by the trier of fact, this court must be reluctant to reverse it.") (citations omitted). Furthermore, we will not reverse factual determinations regarding the extrinsic test absent a clearly erroneous application of the law. *See id.* It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because " 'the over-all impact and effect indicate substantial appropriation.' " *Id.* at 1169 (quoting *Malkin v. Dubinsky,* 146 F.Supp. 111, 114 (S.D.N.Y.1956)).

### 1. *Evidence of Substantial Similarity*

■ Bolton and Goldmark argue that there was insufficient evidence of substantial similarity because the Isley Brothers' expert musicologist, Dr. Gerald Eskelin, failed to show that there was copying of a *combination* of unprotectible elements. On the contrary, Eskelin testified that the two songs shared a combination of five unprotectible elements: (1) the title hook phrase (including the lyric, rhythm, and pitch); (2) the shifted cadence; (3) the instrumental figures; (4) the verse/chorus relationship; and (5) the fade ending. Although the appellants presented testimony from their own expert musicologist, Anthony Ricigliano, he conceded that there were similarities between the two songs and that he had not found the combination of unprotectible elements in the Isley Brothers' song "anywhere in the prior art." The jury heard testimony from both of these experts and "found infringement based on a unique compilation of those elements." We refuse to interfere with the jury's credibility determination, nor do we find

that the jury's finding of substantial similarity was clearly erroneous.

### 2. Independent Creation

■ Bolton and Goldmark also contend that their witnesses rebutted the Isley Brothers' prima facie case of copyright infringement with evidence of independent creation. By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The burden shifts to the defendant to rebut that presumption through proof of independent creation. See Granite Music Corp. v. United Artists Corp., 532 F.2d 718, 721 (9th Cir.1976).

■ The appellants' case of independent creation hinges on three factors: the work tape demonstrating how Bolton and Goldmark created their song, Bolton and Goldmark's history of songwriting, and testimony that their arranger, Walter Afanasieff, contributed two of five unprotectible elements that they allegedly copied. The jury, however, heard the testimony of Bolton, Goldmark, Afanasieff, and Ricigliano about independent creation. The work tape revealed evidence that Bolton may have subconsciously copied a song that he believed to be written by Marvin Gaye. Bolton and Goldmark's history of songwriting presents no direct evidence about this case. And Afanasieff's contributions to Bolton and Goldmark's song were described by the appellants' own expert as "very common." Once again, we refuse to disturb the jury's determination about independent creation. The substantial evidence of copying based on access and substantial similarity was such that a reasonable juror could reject this defense.

### 3. Inverse–Ratio Rule

Although this may be a weak case of access and a circumstantial case of substantial similarity, neither issue warrants reversal of the jury's verdict. An amicus brief on behalf of the recording and motion picture industries warns against watering down the requirements for musical copyright infringement. This case presents no such danger. The Ninth Circuit's inverse-ratio rule requires a lesser showing of substantial similarity if there is a strong showing of access. See Smith, 84 F.3d at 1218. In this case, there was a weak showing of access. We have never held, however, that the inverse ratio rule says a weak showing of access requires a stronger showing of substantial similarity. Nor are we redefining the test of substantial similarity here; we merely find that there was substantial evidence from which the jury could find access and substantial similarity in this case.

### C. Sufficiency of the Deposit Copy

■ The appellants argue that the district court did not have jurisdiction over this case because the Isley Brothers failed to register a complete copy of the song upon which the lawsuit was based. Although the 1909 Copyright Act requires the owner to deposit a "complete copy" of the work with the copyright office, our definition of a "complete copy" is broad and deferential: "Absent intent to defraud and prejudice, inaccuracies in copyright registrations do not bar actions for infringement." Harris v. Emus Records Corp., 734 F.2d 1329, 1335 (9th Cir.1984) (citations omitted).

Bolton and Goldmark argue that in 1964 the Isley Brothers deposited sheet music ("deposit copy") of "Love is a Wonderful Thing" that differed from the recorded version of the song. Furthermore, they claimed that the deposit copy does not include the majority of the musical elements that were part of the infringement claim. At trial, the Isley Brothers' expert, Dr. Eskelin, testified that the deposit copy included all of the song's essential elements such as the title hook, chorus, and pitches. Dr. Eskelin even played the deposit copy for the jury on the keyboard. We refuse to disturb the jury's finding that the Isley Brothers deposited a "complete copy" because (1) there was no intent to defraud and prejudice and (2) any inaccu-

racies in the deposit copy were minor and do not bar the infringement action.

### D. *Attribution of Profits*

 Sony Music claims that the district court improperly applied an assumption that all profits from Bolton and Goldmark's song go to the Isley Brothers, and that no evidence supported the jury's apportionment of profits. A successful copyright plaintiff is allowed to recover only those profits that are "attributable to infringement." 17 U.S.C. § 504(b) (1994). "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id. See also Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828 (9th Cir. 1985) (holding that when all profits do not clearly derive from the infringing material, the copyright owner is not entitled to recover all of the profits); *Gaste*, 863 F.2d at 1070 (finding that where there is "imprecision in the computation of expenses, a court should err on the side of guaranteeing the plaintiff a full recovery"). Thus, the statutory burden of proof lies with Sony Music to prove what percentage of their profits were not attributable to copying the Isley Brothers' "Love is a Wonderful Thing."

Sony Music presented evidence that Bolton's "Love Is a Wonderful Thing" produced only 5–10% of the profits from his album, "Time, Love and Tenderness," and that the song's infringing elements resulted in only 10–15% of the profits from the song. The Isley Brothers, however, attacked the credibility of one of Sony Music's experts. Furthermore, they presented evidence that Bolton's infringing song was the album's lead single, that it was released 19 days before the album, and that Bolton engaged in telephone promotion of the song. The jury found that 28% of the album's profits derived from

the song, and that 66% of the song's profits resulted from infringing elements.

We affirm the jury's apportionment of the profits for several reasons. First, the jury instructions adequately conveyed the burden of proof. Second, the burden of proof was on Sony Music, and the jury chose not to believe Sony Music's experts. Finally, a jury verdict apportioning less than 100% of the profits but more than the percentage estimates of Sony Music's experts does not represent clear error.

### E. *Deduction of Tax Liability*

 Sony Music also argues that the district court erred in allowing Bolton and Goldmark, but not Sony Music, to deduct income taxes due to profits from the album. Whether income taxes are considered "deductible expenses" under § 504(b) is an issue of first impression in this circuit. The Supreme Court held that willful infringers could not deduct income taxes, but it left open the possibility that non-willful infringers could deduct their income taxes from the infringing profits. *See L.P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co.*, 277 U.S. 97, 99–100, 48 S.Ct. 449, 72 L.Ed. 800 (1928). The circuits are split over whether non-willful infringers such as Bolton, Goldmark, and Sony Music can deduct income taxes from their infringing profits. *Compare In Design v. K–Mart Apparel Corp.*, 13 F.3d 559, 567 (2d Cir.1994) (allowing the deduction of income taxes) *with Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 620 F.2d 1166, 1169–70 (6th Cir.1980) (not allowing the deduction of income taxes).

The Second Circuit allowed the deduction of income taxes because if infringers are liable for pre-tax profits, they may end up paying more money than they ever received. *See In Design*, 13 F.3d at 567. Under the Second Circuit's rule, the infringer receives a windfall by (1) paying a smaller damages award and (2) deducting the entire, pre-tax award from gross income on a subsequent tax return. The Sixth Circuit rejected the deduction of income taxes because the increased pre-tax

profits paid to the copyright holder will be balanced out by an eventual tax refund based on the pre-tax award. *See Schnadig*, 620 F.2d at 1169–70. Under the Sixth Circuit's rule, the copyright holder receives a windfall by receiving a larger, pre-tax award.

During the third phase of this trial, the district court adopted the findings of the special master's report regarding the deduction of income taxes. The district court followed the Second Circuit rule and allowed Bolton and Goldmark, as non-willful infringers, to deduct the income taxes and management fees that they paid relating to the infringing song. The district court, however, refused to allow Sony Music to deduct its Net Operating Loss Carry-forward (NOL) because the NOL did not have a "concrete financial impact."

We uphold the district court's decision to allow non-willful infringers to deduct income taxes, but not NOL. In this case, Bolton and Goldmark actually paid income taxes and management fees on the infringing profits. Sony Music, however, never actually paid income taxes on its infringing profits. Rather, Sony Music claimed it offset nearly $1.7 million in taxes on the infringing profits against its parent company's NOL. No court has ever found that NOL is a deductible expense under § 504(b). Furthermore, we find that the district court's distinctions between taxes actually paid and taxes not actually paid was a fair one. Thus, we affirm the district court's calculation of a $4,218,838 damages award against Sony Music.

### F. *Second New Trial Motion*

Finally, Bolton and Goldmark claim that the district court erred in rejecting their second motion for new trial. The district court's denial of a motion for a new trial pursuant to Federal Rule of Civil Procedure 60(b) is reviewed for an abuse of discretion. *See Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989); *Scott v. Ross*, 140 F.3d 1275, 1281

(9th Cir.1998). The abuse of discretion standard applies particularly when the district court's denial is based on the motion's untimeliness. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1294–96 (9th Cir.1992).

Bolton and Goldmark's second motion for a new trial was based on the discovery of new evidence that disputed the Isley Brothers' claim of authorship. A day before the deadline for post-trial motions, the appellees discovered evidence alleging that the Turkcords, a group that played with the Isley Brothers in the mid–1960s, claimed to have written the 1964 song, "Love is a Wonderful Thing." Bolton and Goldmark did not immediately notify the district court of this new evidence. Instead, fourteen days after the deadline for post-trial motions had passed, they filed an additional motion for new trial. The district court rejected the second motion for new trial as untimely filed.

We affirm the district court's denial of the second motion for new trial because the evidence, if true, goes at most to the weight and credibility of the evidence before the jury. At trial, Ronald Isley claimed to have written the song with the deceased guitar legend, Jimi Hendrix. (As a young man, Hendrix played in the Isley Brothers' band.) The Turkcords' claims of authorship are dubious for several reasons. The Turkcords knew about the re-release of "Love is a Wonderful Thing" by United Artists in 1991, yet they claimed that the Isley Brothers had agreed to share the song's royalties with them only after hearing about the damages award in this case on "Inside Edition." Furthermore, Bolton and Goldmark knew about this new evidence before the deadline for the post-trial motions, yet they did not immediately notify the district court.

Even if the Turkcords' claims of authorship are true, a new trial is not warranted in the interests of justice because the Isley Brothers' copyright ownership is not jeopardized. Registration is

prima facie evidence of the validity of a copyright. *See* 17 U.S.C. § 410(c) (1994). This presumption can be rebutted by the defendant's showing that the plaintiff's work is not original. *See North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir.1992). *North Coast*'s definition of originality is broad: "'All that is needed to satisfy both the Constitution and the statute is that the "author" contributed something more than a "merely trivial" variation, something recognizably "his own." Originality in this context means "little more than a prohibition of actual copying."'" *Id.* (quoting *Krofft*, 562 F.2d at 1163 n. 5 (quoting *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 102–03 (2d Cir.1951))). *See also Kamar Int'l Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1061 (9th Cir.1981) (employing a broad definition of originality relating to toy stuffed animals).

In this case, the Isley Brothers undoubtedly contributed something original to "Love is a Wonderful Thing." Their proteges, the Turkcords, purportedly wrote the song, then gave the Isley Brothers' permission to record it after the voice of the Turkcords' lead singer allegedly "cracked." Members of the Turkcords allegedly sang back-up on the record. Yet the Turkcords never copyrighted their song. They relied on the Isley Brothers' alleged promise to share the royalties with them.

The district court did not abuse its discretion in rejecting Bolton and Goldmark's second motion for a new trial based on this evidence. The Turkcords' claims of authorship would not have affected the outcome of the case and at most go to the weight and credibility of the evidence. Bolton and Goldmark's second motion was a last-ditch attempt to discredit the jury's verdict. The district court heard all of the evidence in this case, instructed the jury on the applicable law, yet refused to reverse the jury's verdict pursuant to motion for a judgment as a matter of law. Having found that the law was properly applied in this case, we leave the district court's decisions and the jury's credibility determinations undisturbed.

AFFIRMED.