Robert E. RICE, Plaintiff–Appellant,

v.

FOX BROADCASTING COMPANY, a Delaware Corporation; Fox Television Station, Inc., a Delaware Corporation; Earl Greenburg Productions, Inc., a California Corporation; Nash Entertainment, a California Corporation; SRJ Production, Inc., a California Corporation; Rive Gauche International Television, a California Corporation; International Creative

Management, Inc., a Delaware Corporation; Bruce Nash; Don Weiner; Earl Greenburg; Ronald Glazer; David John; Michael Lancaster; Scott Mitchell; David Next; Steve Wohl; and Leonard Montano, a.k.a Valentino, a.k.a. The Masked Magician, Defendants–Appellees.

Robert E. Rice, Plaintiff–Appellee,

v.

Fox Broadcasting Company, a Delaware Corporation; Fox Television Station, Inc., a Delaware Corporation; Earl Greenburg Productions, Inc., a California Corporation; Nash Entertainment, a California Corporation; SRJ Production, Inc., a California Corporation; Rive Gauche International Television, a California Corporation; International Creative Management, Inc., a Delaware Corporation; Bruce Nash; Don Weiner; Earl Greenburg; Ronald Glazer; David John; Michael Lancaster; Scott Mitchell; David Next; Steve Wohl; and Leonard Montano, a.k.a Valentino, a.k.a. The Masked Magician, Defendants–Appellants.

Nos. 01–56582, 01–56846.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 2002.

Filed May 29, 2003.

---

7. We note again that Keyser Cooper does not appeal her portion of the fee award, so that award should remain unchanged.

Larry A. Sackey, Law Offices of Herbert Hafif, Claremont, CA, argued the cause for the appellant/cross-appellee. Herbert Hafif and Michael G. Dawson were on the briefs.

James H. Wynn, Lord, Bissell & Brook, Los Angeles, CA, argued the cause for the appellees/cross-appellants. Jeffrey S. Kravitz was on the briefs.

Before HUG, BRUNETTI and O'SCANNLAIN, Circuit Judges.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the owner of a copyrighted video can sustain an infringement claim against a television network for its broadcast of a program revealing the secrets of professional magicians.

### I

Robert E. Rice owns the copyright to a home video entitled *The Mystery Magician* that was created in 1986 and reveals how to perform several well-known magic tricks and illusions. Rice created and registered the script for *The Mystery Magician* and signed an agreement with International Creative Management ("ICM") for the purpose of commercially exploiting the video. In February 1986, ICM negotiated a ten-year exclusive video distribution deal on Rice's behalf with CBS/Fox Video Westinghouse. At the end of the contract, Rice entered into agreements with other entities to continue distribution of *The Mystery Magician*. Between 1986 and 1999, approximately 17,000 copies of *The Mystery Magician* were sold worldwide.

Sometime between 1995 and 1997, Fox Broadcasting Company ("Fox") began development of a series of television specials about magic ("*Specials*"). Similar to *The Mystery Magician*, the premise behind Fox's programming idea was revealing the secrets behind famous magic illusions. The first of the *Specials* aired on broadcast television on November 24, 1997, and the subsequent three installments aired on March 3, 1998, May 5, 1998, and October 29, 1998. In addition, video copies of the *Specials* were sold in connection with the broadcasts; viewers were invited to place their telephone orders by calling the toll-free number that appeared on the television screen.

Rice believed that the inspiration behind Fox's series was *The Mystery Magician.* As a result Rice brought suit against individuals and entities associated with production of the *Specials* ("Defendants"). Rice asserted a claim for infringement under the Copyright Act, 17 U.S.C. § 101 *et seq.,* and claims for false advertising under the Lanham Act, 15 U.S.C. § 1125, and California Unfair Business Practices Act, Cal. Bus. & Prof.Code § 17200 *et seq.*

Defendants subsequently filed two motions for summary judgment. On June 26, 2001, the district court entered an order granting their motion on the copyright claim and granting in part and denying in part their motion on the false advertising claims. On August 1, 2001, the district court entered final judgment on the copyright infringement claim and also certified for interlocutory appeal its denial of defendants' motion for summary judgment on the false advertising claims. Rice timely appeals in No. 01–56582, and defendants timely cross-appeal in No. 01–56846.

## II

Claiming that Fox misappropriated the idea for revealing the secrets behind magic illusions and tricks from *The Mystery Magician,* Rice argues that the district court erred in granting summary judgment to defendants on his claim of copyright infringement.

### A

■ In order "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (citation omitted). The latter element may be established by showing that the works

in question "are substantially similar in their protected elements" and that the infringing party "had access" to the copyrighted work. *Metcalf v. Bochco,* 294 F.3d 1069, 1072 (9th. Cir.2002) (citation omitted).[1]

■ To determine whether two works are substantially similar, a two-part analysis—an extrinsic test and an intrinsic test—is applied. *Id.* at 1073. "For summary judgment, only the extrinsic test is important." *Kouf v. Walt Disney Pictures & Television,* 16 F.3d 1042, 1045 (9th Cir. 1994). "[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.*

■ As we have previously stated, the extrinsic test is an objective measure of the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Id.* (citation and internal quotation marks omitted). In applying the extrinsic test, we must distinguish between the protectable and unprotectable material because a party claiming infringement may place "no reliance upon any similarity in expression resulting from unprotectable elements." *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir.1994) (citation and internal quotation marks omitted).

In analyzing the scope of copyright protection afforded to *The Mystery Magician,* we note at the outset that ideas generally do not receive protection, only the *expression* of such ideas do. *Metcalf,* 294 F.3d at 1074. It is true that this dichotomy between an idea and its expression is less clear when the idea and expression are "merged" or practically indistinguishable.

---

1. The existence and validity of Rice's copyright in *The Mystery Magician* is not in dis-

pute. *Rice v. Fox Broad. Co.,* 148 F.Supp.2d 1029, 1048 (C.D.Cal.2001).

However, we have held that "similarities derived from the use of common ideas cannot be protected; otherwise, the first to come up with an idea will corner the market." *Apple*, 35 F.3d at 1443.

■ A closely related limiting doctrine to merger, *scenes a faire*, holds that expressions indispensable and naturally associated with the treatment of a given idea "are treated like ideas and are therefore not protected by copyright." *Id.* at 1444. Therefore, to the extent that *The Mystery Magician* and the *Specials* are similar merely in ideas, or in expression simply due to merger or *scenes a faire*, such similarities do not violate Rice's copyright.

As a result, while similarities in tangible expressive elements fall within the realm of Rice's copyright and are pertinent to our analysis, the mere fact that both *The Mystery Magician* and the *Specials* reveal the secrets behind magic tricks does not by itself constitute infringement. *See, e.g., Kouf*, 16 F.3d at 1045 (attaching "no significance" to the fact that the works in dispute both involved a life struggle of kids fighting insurmountable dangers). Rice's claim, therefore, may only succeed if the *Specials* infringed upon the presentation and stylistic elements of *The Mystery Magician*. *See id.* at 1045–46.

## B

■ Rice's primary argument under the extrinsic test is that the magician depicted in the *Specials* is substantially similar to the magician "character" in his work.

### 1

■ Indeed, Rice goes even further and argues that *The Mystery Magician* himself is subject to copyright protection. While characters are ordinarily not afforded copyright protection, *see Warner Bros. Pictures, Inc. v. Columbia Broad. Sys.*, 216 F.2d 945, 950 (9th Cir.1954), characters that are "especially distinctive" or the "story being told" receive protection apart from the copyrighted work. *See Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1452 (9th Cir.1988); *Metro–Goldwyn–Mayer, Inc. v. Am. Honda Motor Corp.*, 900 F.Supp. 1287, 1295–96 (C.D.Cal.1995).

### a

■ Rice claims that *The Mystery Magician* character warrants copyright protection because it visually depicts a graphical character. In addition, Rice points to testimony by an expert in the field stating that he is unaware of any audiovisual production besides *The Mystery Magician* and the *Specials* that features the theme of a masked magician wearing a disguise to shield himself from possible repercussions by the magic practitioner community.

■ We are not persuaded, however, that the magician revealing the tricks in *The Mystery Magician* is somehow sufficiently delineated to warrant copyright protection. Characters that have received copyright protection have displayed consistent, widely identifiable traits. *See, e.g., Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F.Supp.2d 1206, 1215 (C.D.Cal.1998) (Godzilla); *Metro–Goldwyn–Mayer, Inc.*, 900 F.Supp. at 1297 (James Bond); *Anderson v. Stallone*, 1989 WL 206431, *7 (C.D.Cal.1989) (Rocky Balboa). In contrast, the magician depicted in Rice's work has appeared in only one home video that sold approximately 17,000 copies. Moreover, the magician is dressed in standard magician garb—black tuxedo with tails, a white tuxedo shirt, a black bow tie, and a black cape with red lining—and his role is limited to performing and revealing the magic tricks. *Rice*, 148 F.Supp.2d at 1036. Thus, we must reject Rice's claim that the magician in his video is an "especially distinct" character differing from an ordinary magician in a manner that warrants copyright protection.

### b

■ Rice alternatively argues that the magician in his video is subject to copyright protection "as the story being told." Rice portrays the story as a renegade magician willing to risk retribution and ostracism from the magic practitioner community by revealing the secrets of the trade.

But, the "story" of *The Mystery Magician*, far from focusing on the magician character, concerns the revelation and public dissemination of the secrets behind famous, widely recognized magic illusions and tricks. Indeed, the magician character's dialogue is limited to voice-over narratives explaining how the tricks are performed and a brief commentary at the end. *Rice*, 148 F.Supp.2d at 1036–37. As result, he is merely a "chessman in the game of telling the story [and] he is not within the area of the protection afforded by the copyright." *Warner Bros. Pictures*, 216 F.2d at 950.

### 2

■ Even though we conclude that the magician in Rice's work is not a separately protected character, the extrinsic test requires us to determine further whether the magicians in *The Mystery Magician* and the *Specials* are substantially similar. *Kouf*, 16 F.3d at 1045. And such analysis demonstrates that while there may exist similarities between the magician "characters," any shared attributes of appearance and mysterious demeanor are generic and common to all magicians.

It is true that both magicians wear masks, but even Rice concedes that any magician who reveals the secrets behind magic illusions risks ostracism from the magic community, and that the only way to avoid this backlash is for the magician to conceal his identity. In fact, Mark Tratos, legal counsel for the magician that appeared in the *Specials*, insisted to defendants that his client would only agree to participate in the show if his identity were kept confidential. *Rice*, 148 F.Supp.2d at 1043.

Furthermore, there are only a discrete number of ways to express a magician revealing the secrets behind magic tricks and illusions while disguising his identity. Therefore, under the limiting doctrines of merger and *scenes a faire*, the mere fact that both works feature a masked magician revealing magic tricks cannot constitute copyright infringement.

### C

Irrespective of whether any similarities in the magician "characters" are too generic to support a claim of infringement, Rice argues there is substantial similarity in other expressive elements between *The Mystery Magician* and the *Specials*.

### 1

In support of his claim, Rice points to the dialogue in the respective works. The opening monologues in both *The Mystery Magician* and the *Specials* explain that the secrets of magic tricks are closely guarded. In addition, both closing monologues express a desire to inspire children. However, as the district court correctly noted, the actual dialogue in these segments is quite different, and any generic parallels in overall tone do not rise to the level of substantial similarity. *Rice*, 148 F.Supp.2d at 1058.

### 2

Rice next argues that the settings in both works are substantially similar. However, *The Mystery Magician* was filmed in an empty theater with a ground fog that obscured most of the theater stage. In contrast, the *Specials* were filmed in an empty warehouse which the district court described as having dimen-

sions that "far exceed those of the Rice Video's rather diminutive stage." *Rice,* 148 F.Supp.2d at 1059. Therefore, because any similarities, such as being filmed in a secret location without any audience, are generic and inconsequential, they fail to meet substantial similarity.

3

Rice further points to similarities in the plot and sequence of events in both works. For example, Rice first refers to the fact that *The Mystery Magician* opens with a shot of the feet of an unidentified magician as he walks towards the theater, while the *Specials* open with the host walking into the frame. But, as the district court correctly noted, if anything, this represents a notable difference between the two works in that the *Specials* prominently feature an on-screen host while *The Mystery Magician* does not. *Rice,* 148 F.Supp.2d at 1060.

 Undeterred, Rice also points to the fact that both works involve a magician performing an illusion as if it were a normal performance, but then re-performing the same illusion and explaining to the audience how it was done.[2] But, as mentioned repeatedly, there is simply no copyright protection afforded to the idea of revealing magic tricks. Furthermore, the sequencing of first performing the trick and then revealing the secrets behind the trick is subject to the limiting doctrines of merger and *scenes a faire.*

 As we have stated before, "[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind. Nor does copyright law protect 'scenes a faire,' or scenes that flow naturally from unprotectable basic plot premises." *Metcalf,* 294 F.3d at 1074 (citation and internal quotation marks omitted). In this particular case, there are only a finite number of ways to reveal the secrets behind magic tricks, and the perform and reveal sequence is the most logical "expression" of this idea.[3]

Because disclosure of the secrets behind magic tricks does not receive copyright protection, and the perform and reveal sequence is also unprotectable, there is no substantial similarity in plot and sequence of events between the two works.[4]

4

 Rice also points out that both works possess an overall mood of secrecy and mystery. But, as the district court aptly noted, "it is quite clear that a 'mood' of 'secrecy and mystery' must 'merge' with a show that is about the 'mysteries of magic,' and revelation thereof." *Rice,* 148 F.Supp.2d at 1058. Therefore, as with many of the other alleged abstract similarities in expressive content, any similarities in mood and pace are generic, constitute *scenes a faire,* and merge with the idea of revealing magic tricks.

---

**2.** While Rice does point to other alleged similarities in plot, they merely restate his earlier claims concerning characters, settings, and dialogue.

**3.** The actual magic tricks and sequence of revelation in the two works are also quite different. Of the four installments of the *Specials,* only the first one shares any illusions in common with *The Mystery Magician.* Further comparison shows that of the eleven tricks depicted in the first installment, five are in common with *The Mystery Magician,* but even these are performed in a completely different order. *Rice,* 148 F.Supp.2d at 1038.

**4.** We also note that there are extensive differences in production value between the two works. It is beyond dispute that the *Specials* are more elaborate, have more specials effects, possess a larger cast, and are generally more visually appealing. *Rice,* 148 F.Supp.2d at 1039.

D

The next step in evaluating Rice's claim for infringement is to examine the degree of access that defendants had to *The Mystery Magician.* Under the "inverse ratio rule," we "require a lower standard of proof of substantial similarity when a high degree of access is shown." *Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir.2000); *Shaw v. Lindheim,* 919 F.2d 1353, 1361–62 (9th Cir. 1990). However, even under our duty to construe inferences in the light most favorable to the non-moving party for purposes of summary judgment, *see Kouf,* 16 F.3d at 1044, Rice's evidence as to proof of access is insufficient to trigger the inverse ratio rule. We note that in other circumstances where we have applied the rule, *see, e.g., Shaw,* 919 F.2d at 1361–62; *Metcalf,* 294 F.3d at 1075, concession of access by the defendant to the plaintiff's copyrighted work was a prominent factor in our analysis.

Here the evidence of access is much weaker. First, Rice points to publicity surrounding the release of *The Mystery Magician.* The video was featured on the television show *Entertainment Tonight* on September 26, 1986. *Rice,* 148 F.Supp.2d at 1037. Furthermore, *Inside Magic,* a trade publication, reported on the controversy surrounding the masked magician who appeared in the video and revealed the secrets behind the illusions. *Id.* at 1044 n. 19.

In addition to this publicity, Rice claims that he sent two copies of *The Mystery Magician* and a pitch sheet for a proposed programming idea to Fox's Senior Vice President of Specials and Alternative Programming, Michael Darnell, in March, 1996. However, as Rice concedes, there is no copy of 7061 the purported pitch and he

never received a response from Fox. *Rice,* 148 F.Supp.2d at 1043–44.

Rice also claims that defendants were very much aware of *The Mystery Magician* through a very complex and intricate web of inferences. Rice claims that he gave copies of *The Mystery Magician* to Stephen Marks, his agent at ICM, and that Marks sent a copy of the video to Fox in 1987 as part of an attempt to procure a television special. Rice next claims that on visits to Marks at ICM he would often chat with Steve Wohl, a fellow agent at ICM, and that Wohl repeatedly told Rice that he "loved" the idea behind *The Mystery Magician* and that it would be a "smash hit." Because Wohl was Bruce Nash's agent,[5] Rice infers from this relationship that Nash, who was an active participant along with Darnell in developing the *Specials,* had access to *The Mystery Magician* and draws a "thread" for the copying from Wohl to Nash, and finally to Darnell.

We reject Rice's claims. First, we note that *The Mystery Magician* only sold approximately 17,000 copies between 1986 and 1999; therefore, the video cannot be considered widely disseminated. And as for the complicated thread involving Marks, Wohl, Nash, and Darnell that Rice claims as proof of defendants' access to *The Mystery Magician,* Rice admits that he has no evidence or proof that Wohl provided *The Mystery Magician* to Nash, Darnell or to anyone else at either Nash Entertainment or Fox. Indeed, Rice's claims are based on speculation, conjecture, and inference which are far less than the "high degree of access" required for application of the inverse ratio rule.

Nevertheless, Rice cites to *Metcalf* for the proposition that "[t]he cumulative weight of ... similarities allows the [plain-

**5.** ICM and Wohl became the agent for defen-

dant Nash of Nash Entertainment in 1989.

tiff] to survive summary judgment." 294 F.3d at 1074. In *Metcalf,* the plaintiff submitted his idea and script for a movie to the defendants who rejected the project, but subsequently produced a television series dealing with very similar issues. Both works involved overburdened county hospitals in innercity Los Angeles with mostly black staffs. Both dealt with poverty and urban blight, and featured very similar characters and plot developments. The court in *Metcalf* found the common elements and totality of similarities to raise a triable factual question of substantial similarity, even if the similarities when considered individually were unprotectable. *Id.* at 1073–74.

But here we are not presented with the same pattern of generic similarities as in *Metcalf.* And even more important, our decision in *Metcalf* was based on a form of inverse ratio rule analysis: the plaintiff's case was "strengthened considerably by [defendants'] concession of access to their works." *Id.* at 1075.[6] In *Metcalf,* the writer and producer of the allegedly infringing work conceded that they had read the plaintiff's work. Here, there is no such concession of access as most of Rice's claims are based purely on speculation and inference. Because we are not confronted with the same totality of similarities and the same degree of access, this case is readily distinguishable from *Metcalf.*

**E**

■ The final issue pertaining to Rice's claim for copyright infringement is whether the district court properly exercised its discretion in disregarding the testimony of his expert witness, Judith Kauffman. While both parties offered expert testimony analyzing the alleged similarities between *The Mystery Magician* and the

*Specials,* the district court found, "[n]either expert opinion in this case is very relevant to the conclusions drawn by the Court; the Court does not rely on either." *Rice,* 148 F.Supp.2d at 1055 n. 23.

Under Fed.R.Evid. 702: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise...." In addition, we have recognized that "[t]he extrinsic test often requires analytical dissection of a work and expert testimony." *Three Boys Music Corp.,* 212 F.3d at 485.

Here, Rice offered the expert testimony of Kauffman who has extensive experience in the film and television business as a development and production executive, script consultant, and producer. In her deposition, Kauffman stated that both magician "characters" resemble:

A magician anti-hero who embarks upon a simple, direct approach to the age-old "no-no" of telling tales out of school by revealing highly secret stage illusions to the public. Despite a grave fear of the repercussions stemming from "breaking the magician's code," he does it anyway for altruistic reasons—so young viewers will be inspired, a new appreciation for magic will be rekindled, and bigger and better tricks will be created.

Kauffman also asserted that there were similarities in plot, sequence of events, dialogue, style, setting, and mood between the two works. On appeal, Rice argues that Kauffman's testimony presents a triable issue of fact as to substantial similarity,

**6.** The *Metcalf* court did not explicitly state that it was applying the inverse ratio rule; however, as noted above, the court found

defendants' access to the plaintiff's copyrighted work to be an important factor in its substantial similarity analysis.

and that the district court erred by disregarding it.

The pertinent question before us, therefore, is whether in light of its gatekeeping role, did the district court abuse its discretion in disregarding the testimony of both Kauffman, Rice's expert witness, and defendants' expert witness? The answer is clearly no.

The district court engaged in an extensive analysis of the alleged similarities in expressive elements between *The Mystery Magician* and the *Specials*. In deciding to disregard Kauffman's testimony, the district court could have simply deemed it unhelpful due to its abstract nature. Indeed, in the course of its written opinion, the district court analyzed and rejected the legal significance of many of the points set forth by Kauffman. The district court concluded that Rice's claims of substantial similarity were either foreclosed by the limiting doctrines of merger and *scenes a faire*, or too abstract to constitute copyright infringement. Because Kauffman's testimony merely restated many of these same generic similarities in expressive content, we are satisfied that the district court was well within its discretion in disregarding Kauffman's testimony.

### F

Accordingly, we conclude that Rice's claims of access, as well as his claims of similarities, are too spurious to satisfy the extrinsic test. Because a plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, *see Kouf*, 16 F.3d at 1045, we further conclude that the district court properly granted summary judgment to defendants on Rice's copyright infringement claim.

### III

Turning to the cross-appeal, defendants challenge the district court's denial of their motion for summary judgment on Rice's false advertising claims.

### A

■ Rice's federal false advertising claim is based on several alleged false statements and misrepresentations made by defendants in reference to the *Specials*. In order to prove a claim for false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a claimant must establish: 1) in advertisements, defendant made false statements of fact about its own or another's product; 2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; 3) such deception is material, in that it is likely to influence the purchasing decision; 4) defendant caused its falsely advertised goods to enter interstate commerce; and 5) plaintiff has been or is likely to be injured as the result of the foregoing either by direct diversion of sales from itself to defendant, or by lessening of the goodwill which its products enjoy with the buying public.

*See Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir.1990) (per curiam) (citation omitted).

Here, the alleged false advertisements are a statement by the host of the *Specials* that *"tonight, for the first time on television,"* we will reveal the incredible secret of sawing a woman in half, and statements contained on the jacket cover for the videotape version, including: "Magic's Biggest Secrets *Finally* Revealed," *"Never Before* has a magician dared to reveal the dark secrets behind the world's mystifying illusions," and "You've Always Wondered How They ... Saw a woman in half ... *Now for the first time*, you'll learn the secrets behind these and many, many more tricks and illusions." *Rice*, 148

F.Supp.2d at 1047–48 (emphasis in original).

### 1

Defendants first argue that these alleged false statements are not even advertising, and therefore do not fall within the purview of the Lanham Act. We have previously held that representations constitute commercial advertising or promotion under the Lanham Act if they are:

1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a 'classic advertising campaign,' but may consist instead of more informal types of 'promotion,' the representations 4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

*Coastal Abstract Serv. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir.1999). The statements contained on the video jacket readily satisfy this four-part criteria.

The alleged false statements made by the host, however, do not meet this test. The core notion of commercial speech is "speech which does no more than propose a commercial transaction." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (citation and internal quotation marks omitted). The claim that *"tonight, for the first time on television ..."* was part of the show itself, and was not made in promotion or marketing of the *Specials*. Accordingly, it is not actionable as commercial advertising or promotion under the Lanham Act.

### 2

■ As for the alleged false statements contained on the video jacket, the question remains whether such statements were even material. The test is whether the "deception is material, in that it is likely to influence the purchasing decision...." *Cook, Perkiss, and Liehe, Inc.*, 911 F.2d at 244. The videotapes of the *Specials* were not sold in retail stores. Instead, a toll-free phone number appeared after the broadcasts on Fox inviting viewers to call and order a copy. As such, the videotape jacket could not be observed by potential consumers, and therefore could not influence the purchasing decision. While there is some evidence in the record that the videotapes were available for purchase over the Internet, the video jacket was never depicted on any of the websites. Accordingly, because there is no evidence that a potential consumer could view the offending videotape jacket prior to purchase, any deception relating to advertisement of the videos must be immaterial.

### 3

Because any false statements made by the host during the *Specials* do not constitute advertising, and any false statements made on the video jacket are immaterial, the district court erred in denying defendants' motion for summary judgment on Rice's Lanham Act claim.[7]

### B

As to Rice's state law claim, the California Unfair Business Practices Act defines unfair competition as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising...." Cal. Bus. & Prof.Code

---

**7.** Accordingly we need not address defendants' additional arguments that the statements are in fact true, or alternatively merely constitute puffery.

§ 17200. Rice concedes that his unfair competition claim under § 17200 is dependent on his false advertisement claim under the Lanham Act: "The parties agree that they rise and fall together." *Rice*, 148 F.Supp.2d at 1068.

Because we conclude that the district court erred in not granting summary judgment to defendants on Rice's federal false advertising claim, we further conclude that defendants are entitled to summary judgment on Rice's state unfair competition claim as well.[8]

## IV

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment to defendants on Rice's copyright infringement claim and REVERSE the district court's denial of summary judgment to defendants on Rice's false advertising claims.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

[8.] The standard for evaluating false advertising claims under Section 17200 is as follows:

> To survive summary judgment, plaintiff must prove that defendants' statements are misleading to a reasonable consumer. Under the reasonable consumer standard, plaintiff is required to show not simply that the defendants' bulletins *could* mislead the public, but that they were *likely* to mislead the public. Furthermore, anecdotal evidence alone is insufficient to prove that the public is likely to be misled. Thus, to prevail, plaintiff must demonstrate by extrinsic evidence, such as consumer survey evidence, that the challenged statements tend to mislead consumers.

*Haskell v. Time, Inc.*, 965 F.Supp. 1398, 1406–07 (E.D.Cal.1997) (citation and internal quotation marks omitted). Therefore, independent of whether Rice's § 17200 claim "rise[s] and fall[s]" with his Lanham Act claim, Rice has not satisfied this threshold for a § 17200 claim because there is no evidence of a reasonable consumer being misled by defendants' alleged false statements.