**COSMOS JEWELRY LTD, a Hawaiian Corporation, Plaintiff,**

v.

**PO SUN HON CO., a California corporation, and Alan Hon, an individual, Defendants.**

**No. CV 03–753 CBMMCX.**

United States District Court, C.D. California, Western Division.

July 18, 2006.

As Amended Feb. 13, 2007.

Rod S. Berman, Elizabeth Barrowman
Gibson, Ryan S. Mauck, Jeffer Mangels
Butler and Marmaro, Los Angeles, CA,
Genevieve C. Nadeau, Paul Hastings Jano-
sky and Walker, Los Angeles, CA, for
Cosmos Jewelry Ltd., Plaintiff.

A. Justin Lum, A. Justin Lum Law Of-
fices, South Pasadena, CA, Jeffrey N.
Mausner, John R. Yates, Jr., Berman

Mausner & Resser, Los Angeles, CA, for Po Sun Hon Co., Alan Hon, Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARSHALL, District Judge.

This matter came before the Court for a bench trial, the Honorable Consuelo B. Marshall, United States District Judge, presiding, on March 28 and 29 and April 4 and 5, 2006. Upon consideration of the testimony and evidence received, the Court's evaluation of the demeanor and credibility of the witnesses, the Pretrial Conference Order and the Proposed Findings of Fact and Conclusions of Law submitted by the Parties, the Court sets forth the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## *FINDINGS OF FACT*

### I. The Parties and the Litigation

#### A. Plaintiff

1. Plaintiff Cosmos Jewelry Ltd. ("Cosmos") is a small, family-owned business run by Denny Wong, his sister, and their mother, with its principal place of business in the state of Hawaii.

2. Mr. Wong is the president and chief-jewelry designer for Cosmos.

3. Mr. Wong has been in the jewelry business in Honolulu, Hawaii for 20 years. He has designed jewelry since 1980, and has spent many years developing his craft as a jewelry designer and artist.

4. Cosmos' operations have expanded significantly through the years; it now has a total of twelve (12) employees.

5. Mr. Wong has won several awards in jewelry design contests, including those sponsored by the Hawaiian Jewelers Association.

#### B. Defendants

6. Defendant Alan Hon is a jewelry designer and importer who started selling pieces in the Hawaiian market in 1981.

7. Defendant Hon travels to Hawaii approximately four to five times per year to promote and sell his jewelry to local retailers. Defendant Hon testified that most of his transactions with jewelry store owners are conducted in private offices, rather than on the showroom floors.

8. Since getting his start in the business, Defendant Hon has been affiliated with several different jewelry wholesalers and importers.

9. Most recently, in about 1999–2000, Defendant Hon changed the name of his jewelry company from Sky Dragon Jewelry to Po Sun Hon, Co., the other Defendant in this action.

#### C. Plaintiff's Claims

10. On January 31, 2003, Cosmos filed its Complaint against Defendants for (1) copyright infringement; (2) trade dress infringement; and (3) unfair competition.

11. Cosmos alleges that Defendants have marketed and sold jewelry that is strikingly similar, if not identical, to its own copyrighted and trademarked designs.

### II. The Cosmos Plumeria Lei Series

#### A. Creation, Copyright and Trademark

12. In 1993, Mr. Wong created, and Cosmos started manufacturing and selling, the first pieces of a line of gold jewelry reflecting Mr. Wong's interpretation of the plumeria flower blossom.

13. Mr. Wong undertook extensive and repeated efforts in developing the final form of his plumeria jewelry.

14. First, Mr. Wong made a "silver master" and various wax molds of a single

plumeria blossom in order to arrive at an artistic interpretation with which he was satisfied.

15. Mr. Wong then replicated his design in 14 karat yellow gold.

16. Once Mr. Wong had completed a satisfactory gold cast of the blossom, he experimented with different finishes.

17. Mr. Wong eventually settled on the use of a "sand-blasted" finish with a "high polish" edge, which he felt best reflected the curve of the plumeria petals and the softness of their texture.

18. Different sand-blasted finishes can be created by using different size grains of sand. In order to create the particular finish on his plumeria pieces, Mr. Wong, through Cosmos, purchases various commercial grades of sand and proceeds to mix them according to a specific formula which is not publicly available.

19. As established by the testimony of Defendants' expert, Mr. Jeff Georgantes, both sandblasting and high polishing are standard techniques available to individuals involved in the jewelry design business. During cross-examination, Mr. Wong himself agreed that the use of these techniques in combination is "the most common way ... to create contrast between an edge and an adjacent surface."

20. Once he had perfected his single plumeria blossom design, Mr. Wong proceeded to incorporate it into specific pieces of yellow gold jewelry, including rings, earrings, pendants, bracelets and necklaces. Some of these pieces feature only a single blossom, while others include multiple blossoms of varying sizes, together with gemstones, pearls and/or other design "flourishes," such as leaves.

21. After Mr. Wong had created a number of these pieces, Cosmos obtained Copyright Registration Certificate No. VA 804–690, effective October 14, 1997, and Supplemental Copyright Registration Cer-

tificate No. VA 1–006–840, effective June 1, 2000, for the "Tropical Memory Collection—Plumeria Lei Series." Included in the series are 28 yellow gold plumeria pieces designed by Wong, consisting of both single-blossom interpretations and multi-blossom arrangements.

22. Cosmos also obtained Trademark Registration Certificate No. 2,932,169 for Mr. Wong's single plumeria blossom design, described thereupon as "a stylized representation of a plumeria blossom," the petals of which "have a sand-blasted matte finish with high-polished shiny edges."

23. Cosmos currently markets its copyrighted pieces in Hawaii as the "Plumeria Lei Collection (Tropical Memories)."

24. Cosmos also markets the copyrighted pieces in Alaska as the "Forget–Me–Not Collection," referring to the Alaskan state flower, which has many features in common with the plumeria blossom, including the number and arrangement of the petals.

**B. Promotion and Popularity**

25. Cosmos commenced selling Mr. Wong's plumeria pieces in 1993, to over 20 jewelry stores on the islands of Oahu, Maui, Kauai, and Hawaii. By the end of 1999, Cosmos sold plumeria jewelry to over 60 jewelry stores, including four or five stores in California.

26. Most of the jewelry stores which carry the Cosmos plumeria line display the individual pieces in showcases or window displays. Since 1997, many of these displays have been accompanied by "counter cards," highlighting Mr. Wong's name and giving a brief description of the jewelry and its history.

27. Cosmos has long been involved in "cooperative" print media advertising with the stores with which its jewelry is associated. Cosmos and the store owners share responsibility for the total advertising costs.

28. Cosmos has also regularly taken out advertisements in the "in-flight" magazines of Hawaii-based commercial airlines, such as Aloha Airline's *Spirit of Aloha*. These advertisements are necessarily viewed by a large number of people, primarily tourists.

29. Cosmos' total advertising budget for the previous year was almost $200,000. Over the last 13 years, it has spent over one million in advertising.

30. Mr. Wong has attended many national jewelry trade shows, including shows in New York, Tuscon, and Miami, to further promote the Plumeria Lei Series.

31. Mr. Wong has promoted and continues to promote the Plumeria Lei series pieces by visiting jewelry stores on the Hawaiian Islands and showing and displaying his jewelry.

32. Mr. Wong has a website, www. dennywong.com, that is dedicated to his jewelry designs, including the Plumeria Lei series.

33. As established by the testimony of Mr. Oscar Paassalacqua, owner of Originals By Oscar, two jewelry stores located in Kailua–Kona, Hawaii, and Delwyn Y. Higa, owner of Island Gold Collection, a jewelry store located in Honolulu, Hawaii, potential jewelry purchasers routinely identify and ask for the "Denny Wong" plumeria designs by name.

34. The Plumeria Lei Series is Mr. Paassalacqua's best-selling jewelry line, accounting for more than ten percent of his total annual sales; it accounts for about 15 percent of Mr. Higa's total sales.

35. Mr. Passalacqua and Mr. Higa also confirmed that Denny Wong's plumeria designs are "collector's items," such that purchasers frequently seek to add different pieces to their existing collection.

36. "Jewel of Paradise," a jewelry store on the island of Kauai, has elected to put Denny Wong's name on its shingle, to indicate to the public that it carries the Cosmos plumeria line and other popular Wong designs.

37. Mr. Wong's sister, Donna Wu, who is also a jewelry designer for Cosmos, won "Second Prize and Popular Award" in a design contest sponsored by the Hawaii Jewelers' Association, for a piece included in the plumeria line in 1994.

## C. Characteristics of the Cosmos Plumeria Blossom and Plumeria Blossoms Found in Nature

38. The plumeria flower grows abundantly on the Hawaiian islands. It is used on a myriad of tourist memorabilia: T-shirts, mugs, handbags and jewelry.

39. The natural plumeria flower blossom always has five petals, which are arranged like a pinwheel. As the observer faces the blossom, the left edge of each petal overlaps the right edge of the preceding petal.

40. The plumeria blossom occurs naturally in several colors, or combinations of colors, including white, yellow, pink, and rose.

41. The shape of the tip of the petals varies from sharply pointed to smoothly rounded. As established by the testimony of expert witness Dr. Kent Bridges, a professor of Botany at the University of Hawaii, these two extreme shapes are found with approximately equal frequency and occur more frequently than intermediate shapes. The length to width ratio of the petals also varies substantially.

42. In nature, individual petals of a plumeria flower blossom are not connected to each other, but rather grow downward into a corolla tube which is a few inches in length.

43. Like the natural flower, the Denny Wong/Cosmos plumeria blossom has five petals, arranged in a pinwheel shape, with a slight overlap between the left edge of

the preceding petal and the right edge of the succeeding petal.

44. The shape of the tips of the petals in the Wong/Cosmos design is "intermediate" (i.e., slightly pointed).

45. The length to width ratio of the petals is 1.32, consistent with approximately eight to ten percent of plumeria blossoms found in nature.

46. The petals on the Wong/Cosmos blossoms meet in the middle and are fused together on their sides. A diamond or other gemstone is set in the indentation where the petals meet.

47. The color of the Wong/Cosmos blossoms is yellow (gold) and the texture is hard (metallic).

### III. Defendants' Plumeria Jewelry

48. In or about 1999, Defendant Hon decided to design jewelry based on the plumeria blossom. In January of 1999, he took various photos of the plumeria blossom in nature and purchased picture postcards of the flower.

49. Defendant Hon undertook these endeavors in order to help him appreciate the different shapes of the flower during different phases of development, so that he could design his jewelry to be readily recognizable as plumeria.

50. In 2000, Defendant Hon began marketing and selling, through Po Sun Hon Co., his line of yellow gold plumeria jewelry, including rings, earring, pendants, necklaces and bracelets, to jewelry store owners in Hawaii and California.

51. Defendant Hon's plumeria pieces include single blossom interpretations as well as multi-blossom arrangements.

52. The petals of many of Defendant Hon's yellow gold plumeria pieces contain a sandblast finish on the petal surface and high polish on the edges, which Hon selected to convey the visual distinction between the curled petal edge and adjacent petal surface that exist in nature, and to reflect the softness and smoothness of the petal's texture.

53. Some of Defendant Hon's pieces have distinctly different features, such as "diamond cuts" on the center of each individual petal and/or "scalloped," rather than high-polished edges. Cosmos does not dispute that these pieces are not "copies" of Mr. Wong's designs.

54. Po Sun Hon Co. obtained Copyright Registration Certificate No. VA545–056, effective April 17, 2002, for the "Allen Hon Design Collection—Plumeria Flower Jewelry." Included in the collection are numerous pieces of single and multi-blossom yellow gold plumeria jewelry. Protection is specifically claimed for the use of "Sand Blast Finish on Pedals" [sic] and "High Polish on Raised Areas."

55. Po Sun Hon Co. advertised Mr. Hon's plumeria designs in *Hana Hou!*, the in-flight magazine for *Hawaiian* airlines, between the 2000 and 2002.

56. In 2000, Mr. Wong found and purchased four of Defendants' yellow gold plumeria pieces in Hawaii. These pieces consist of a single blossom ring, a pair of single blossom earrings, a three blossom ring, and a pair of "S" shaped three-blossom clip-back earrings, and are the only physical pieces of Defendants' jewelry that were offered into evidence.

57. Mr. Hon admits that, as early as late 2000, he saw pieces from the Wong/Cosmos Plumeria Lei series, in in-flight magazines and other publications exclusive to the jewelry industry.

### IV. Differences Between the Cosmos and Hon Plumeria Lines

#### A. Inherent Differences Between the Designs

#### 1. Individual Blossoms

58. The petals in the Hon design are shaped differently than the petals in the

Cosmos design. If the Hon petals were cut across their width at the midpoint between the blossom center and the end of the petal, the cross-section would form an arc in the shape of an inverted letter "u". In contrast, a cross section of the Cosmos petals taken at their midpoint would form an arc in a slight "u" shape. Essentially, the Cosmos petals are slightly concave, while the Hon petals are convex.

59. The petals in the Hon design overlap more, and are set at more of an angle in relation to each other than the petals in the Cosmos design, which lay flatter and overlap less.

60. The diamond in the blossom center of the Hon design is in a pavé setting, which is formed by scraping metal from the surfaces of the blossom surrounding the diamond until the metal presses tightly against the diamond. In contrast, the Cosmos design utilizes a five-prong setting, which is a separate piece inserted through the center hold of the blossom, and into which the diamond or other gem is placed.

61. The high polished edge of the Hon design is wide, long, and extends around most of the top, side and bottom edge surfaces of the plumeria blossom petals on one side. The high polish edge of the Cosmos design is narrow, short, and is only on the top edge surface of the blossom petals and a portion of the side edge surface.

62. The sandblast finish of the Hon design is slightly smoother, or less coarse, than the sandblast finish of the Cosmos design.

63. The Cosmos blossom is visibly of a much higher quality than the Hon blossom, having a more intricate finish and more securely set stones.

## 2. Multi–Blossom Arrangements

64. *Three–Blossom "S" Shaped Earrings:* Both Cosmos and Hon make "clip-back" earrings with three plumeria blossoms that form a shape similar to that of the letter "S". In the Cosmos design, all three blossoms are connected to each other, and the only leaves are located at the bottom of the earring. In the Hon design, the blossoms are not directly connected, but instead are separated by leaves so that they do not touch. The Hon design has a small leaf below the bottom of each blossom.

65. *Two–Blossom "Wave" Earrings:* Both Cosmos and Hon designed a two blossom earring connected by a curved piece of metal ("wave connector"). The Hon design, but not the Cosmos design, features a leaf below the upper blossom, and above the lower blossom.

66. *Slider Pendants:* Cosmos designed an eight flower "slider" pendant with leaves. One row of six blossoms is arranged in the general shape of a slight "S" curve, and appears to contain two blossoms in each of three different sizes, with the largest two located in the center of the piece. One of the remaining two blossoms is located below the six blossom row, and slightly to the left of center. The corresponding Hon pendant designs are composed of nine, ten, and thirteen blossoms, respectively. The nine blossom pendant has three very small, and one slightly larger blossom in the center from right to left at the bottom. Above these blossoms are five larger blossoms, with the largest at the top and center of the piece. The ten blossom pendant features a seven blossom row of smaller blossoms below a three blossom row of larger blossoms, with the largest blossom in the piece located at top center. The thirteen blossom pendant consists of nine small and four larger blossoms, prominent use of gold leaves between and among the blossoms, and the option of a black pearl hanging from the bottom center.

67. *Wave Necklaces:* Cosmos makes a necklace with five blossoms connected by "wave" connectors. The Hon design features 10 blossoms—five each to the left and right of center—surrounding a center cluster of three to five blossoms at the center and low point, to which a black pearl is sometimes attached.

68. *Three–Flower Rings:* The Cosmos design contains three blossoms which slightly overlap, flanked by leaves on both ends. The Hon designs feature leaves and decorative gold balls *between* each blossom.

## B. Public Perception

69. Several experienced Hawaiian jewelry store owners—Mr. Higa and Mr. Passalacqua—mistook some of the Hon plumeria designs for Wong/Cosmos designs when presented with pictures of the Hon pieces. However, neither of these individuals actually compared the physical pieces to one another.

70. These individuals further testified that, prior to the introduction of the Cosmos Plumeria Lei Series, they had never seen plumeria jewelry with the same general look and design features.

71. Another jewelry store owner, Alice Chow Bower, testified that people who come to her shop "specially look for Denny Wong design[s]." Ms. Bower further testified that she saw an advertisement for Po Sun Hon/Alan Hon's plumeria jewelry and thought it was Mr. Wong's. It was only upon close examination that she realized it was from a different designer.

## V. Contact Between Mr. Wong and Mr. Hon

72. Defendant Hon and Mr. Wong first met each other in 2000 at a store in Hawaii. After the store owner introduced the two to each other, Defendant Hon told Mr. Wong that he was a jewelry wholesaler from Hong Kong, and a friend of Mr.

Hung Tien Lu, a jewelry designer whom Cosmos had sued in the District Court for the District of Hawaii, for infringing the Plumeria Lei series. The Court understands that the parties reached a settlement in that matter. Defendant Hon also informed Mr. Wong that one of his customers had asked him to copy Mr. Wong's plumeria line, but that he had refused due to the fact that both he and Mr. Wong were Chinese.

73. Approximately six months later, in November 2000, Defendant Hon and Mr. Wong had another chance meeting at a jewelry store, Grande Gem, in Kauai.

74. At this second meeting, Mr. Wong confronted Mr. Hon about Defendants' [Mr. Hon and Po Sun Hon Co.'s] sales of plumeria jewelry in the Hawaiian market which he [Wong] believed were copies of his own designs. Defendant Hon denied that he had copied Mr. Wong's designs, stating instead that he had created his designs based on his independent study of the natural plumeria flower.

75. Mr. Hon urged Mr. Wong not to sue him for copyright infringement because the two were both Chinese and because he believed his designs to be fundamentally different from those of Mr. Wong. The discussion grew increasingly heated before the two eventually parted.

76. As soon as Mr. Wong arrived back at his office, he made handwritten notes to memorialize his conversation with Defendant Hon. The notes reflect that Mr. Wong perceived Mr. Hon to have threatened to destroy his business by inundating the Hawaii market with lesser quality plumeria jewelry and that Defendant Hon was aware of the success of the Cosmos plumeria line and desired to gain an equivalent share of the market.

77. On November 29, 2000, counsel for Mr. Wong, Elizabeth Barrowman Gibson,

wrote a letter to Mr. Hon reflecting Mr. Wong's understanding that Mr. Hon would make certain changes to his plumeria jewelry line, such that it would "no longer infringe[ ]" on Mr. Wong's rights.

78. Mr. Hon responded through his counsel on December 19, 2000, denying that any of the Po Sun Hon Co. plumeria designs infringes Cosmos copyright registration.

## VI. Po Sun Hon Co.'s Profits from Plumeria Jewelry Sales

79. A large portion of Po Sun Hon Co.'s total profits is attributable to its sales of plumeria-themed jewelry.

80. Invoices dated from 2000 through 2003 establish that Po Sun Hon Co. obtained at least $2,341,526.52 in gross sales from selling plumeria jewelry. This figure was derived through calculations performed by a paralegal with Plaintiff's counsel's firm, using two volumes of invoices produced by Defendants in response to Plaintiff's document requests during discovery (Plaintiff's Exhibit 271). Ms. Garcia testified before the Court that while she reviewed all of the invoices to check for duplicates and "returned" jewelry, she was unable to distinguish between plumeria and nonplumeria jewelry in the invoices because of poor quality of the invoice documents. Ms. Garcia further testified that, after excluding any identifiable duplicates and/or "returned" jewelry, the gross sales for each of the years 2000 through mid–2003 were as follows: $368,565.33; $786,961; $754,236.93; $431,763.26. These same figures are reflected in Plaintiff's Exhibit 302.

81. Defendants have not produced any credible evidence of deductible costs or apportionment (i.e., evidence showing that a greater portion of the revenues were actually generated from sales of jewelry other than the Plumeria line).

## CONCLUSIONS OF LAW

### I. Copyright Infringement

#### A. Prima Facie Case

82. "A claim for copyright infringement has two elements: (1) ownership of the [valid] copyright; and (2) infringement— that the defendant copied protected elements of the plaintiff's work." *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1037 (9th Cir.2000). "If the plaintiff copyright holder survives the first step, i.e., it establishes that it owns a valid copyright, then the plaintiff must establish infringement by showing both access to its copyrighted material on the part of the alleged infringer and substantial similarity between the copyrighted work and the alleged infringing work." *Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1144 (9th Cir.2003).

#### 1. Validity of the Copyright/Originality

83. Cosmos' possession of a copyright registration for its Plumeria Lei series is *prima facie* evidence of Cosmos' ownership and the validity of the copyrights covered thereby. *Entm't Research Group, Inc. v. Genesis Creative Group, Inc.*, 122 F.3d 1211, 1217 (9th Cir.1997) ("Under the copyright laws, the registration of a copyright certificate constitutes prima facie evidence of the validity of a copyright in a judicial proceeding commenced within five years of the copyright's first publication.").

84. Originality is the "sine qua non of copyrightability." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). "Originality, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.* (citing 1

M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990)) (hereinafter "Nimmer").

85. An individual cannot get copyright protection for elements of expression that inevitably follow from the idea of natural phenomena. *See, e.g., Satava v. Lowry,* 323 F.3d 805, 810 (9th Cir.2003) ("Satava may not prevent others from copying aspects of his [glass-in-glass jellyfish] sculptures resulting from ... jellyfish physiology ..."); *Aliotti v. R. Dakin & Co.,* 831 F.2d 898, 901 (9th Cir.1987) (no copyright protection for elements of expression in stuffed dinosaur dolls resulting from "the physiognomy of dinosaurs"). There must be some "distinctive" design elements not derived from characteristics inherent in the naturally occurring entity. *Satava,* 323 F.3d at 810 ("Although the amount of creative input by the author required to meet the originality standard is low, it is not negligible. There must be something more than a 'merely trivial' variation, something recognizably the artist's own.") (internal citations omitted).

86. Based on this precedent, the Court concludes that Cosmos cannot be afforded copyright protection for its representation of the plumeria flower as having five petals slightly overlapping, slightly longer than they are wide, and with slightly pointed tips, as all of these features occur frequently in natural plumeria flowers. *Accord Satava,* 323 F.3d at 811 ("Satava may not prevent others from depicting jellyfish with tendril-like tentacles or rounded bells, because many jellyfish possess those body parts. He may not prevent others from depicting jellyfish in bright colors, because many jellyfish are brightly colored. He may not prevent others from depicting jellyfish swimming vertically, because jelly fish swim vertically in nature ....").

87. The Court further concludes that Cosmos cannot be afforded copyright

protection for its use of a "sand-blasted" finish on the body of the petals and "high-polish" finish on the edges, as both of these finishing techniques, either individually or in combination, are "standard, stock, or common" to the medium of gold jewelry making—i.e., they are "scenes a faire." *Id.* at 810; *Swirsky v. Carey,* 376 F.3d 841, 846 n. 11 (9th Cir.2004) ("[S]cenes a faire are common expressions indispensable to the expression of particular ideas in a relevant field; they are treated as unprotectable by copyright, in the manner of ideas."); *cf. Aaron Basha Corp. v. Felix B. Vollman, Inc.,* 88 F.Supp.2d 226, 230 (S.D.N.Y.2000) ("[T]he idea of using precious metals, gemstones, and enamel to decorate a pendant is unprotectable, since these decorative features are commonly used throughout the jewelry business.").

88. For this same reason, the Court concludes that Cosmos is not entitled to copyright protection for its depiction of the plumeria blossom as having hard petals and a yellow color, as these are intrinsic characteristics of the rendering material—i.e., yellow gold.

89. After omitting these "unprotectable" elements, the Court concludes that the only copyrightable aspects of the Cosmos plumeria designs are the minute characteristics of the blossom petals, the arrangement of blossoms and other flourishes in different variations on the "multi-blossom" pendants, rings, earrings, etc., and the particular "mixture" of sand used in producing the sand-blast finish. *Accord Satava,* 323 F.3d at 812 ("We do not mean to suggest that Satava has added nothing copyrightable to his jellyfish sculptures. He has made some copyrightable contributions: the distinctive curls of particular tendrils; the arrangement of certain hues; the unique shape of jellyfishes' bells."); *Yurman Design, Inc. v. PAJ, Inc.,* 262

F.3d 101, 110 (2d Cir.2001) ("originality in jewelry design inhered in the ways plaintiff 'recast and arranged' standard elements."). Thus, Cosmos can prevail on its copyright claim if it can prove that Defendant Hon, having had access to its designs, produced plumeria jewelry that is sufficiently similar with respect to the particular protected characteristics indicated above.

### 2. Whether Defendant Hon Had Access to Cosmos' Plumeria Lei Series Designs

■ 90. Under copyright law, "access" equates with a reasonable opportunity by the defendant to view or to copy the plaintiff's work. *See, e.g., Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 482 (9th Cir.2000) ("Proof of access requires an opportunity to view or to copy plaintiff's work. This is often described as providing a 'reasonable opportunity' or 'reasonable possibility' of viewing the plaintiff's work.") (internal citations omitted).

91. "Access" may be proven by circumstantial evidence in either of two ways: (1) a particular chain of events is established between the plaintiff's work and the defendant's access to that work (such as through dealings with a publisher or record company), or (2) the plaintiff's work has been widely disseminated. *Three Boys Music Corp.,* 212 F.3d at 482 (9th Cir.2000).

92. Based on the totality of the evidence, the Court concludes that Defendant Hon had access to the Wong/Cosmos plumeria designs. Mr. Wong's work was widely disseminated and advertised throughout the Hawaiian Islands long before 1999, the time at which Hon began producing his designs. Because Defendant Hon made frequent plane trips to and between the islands and, more significantly, frequented the same or geographically proximate jewelry stores as those which carried the Plumeria Lei series, he had a

reasonable opportunity to view some of Wong's designs prior to embarking on his own design efforts.

93. The fact that Defendant Hon may have elected to conduct most of his meetings with Hawaii jewelry store owners in "offices" outside of their main showrooms does not alter the Court's conclusion. Defendant Hon's presence at those stores clearly provided him with a reasonable opportunity to view Mr. Wong's designs. *See* 4–13 Nimmer § 13.02 ("The trier of fact may conclude that the person who created defendant's work had, but did not avail himself of, the opportunity to view, but this conclusion properly goes to the ultimate issue of copying, and not to the subordinate issue of access."). In addition, Defendant Hon's testimony that he never entered actual jewelry stores is belied by the evidence that the late–2000 "chance" meeting between himself and Mr. Wong took place at the Gem Palace jewelry store in Kauai.

### 3. Whether the Hon Plumeria Designs are Substantially Similar to the Cosmos Designs

94. In determining whether two works are "substantially similar" for the purposes of copyright infringement, the Ninth Circuit "employ[s] a two-part analysis: an objective extrinsic test and a subjective intrinsic test." *Swirsky,* 376 F.3d at 845.

■ 95. "The extrinsic test considers whether two works share a similarity of ideas and expression as measured by external, objective criteria [and] ... requires analytical dissection of a work and expert testimony." *Id.* (internal quotations omitted).

96. The intrinsic test measures "substantial similarity in expression ... depending upon the response of the ordinary reasonable person." *Brown Bag Software v. Symantec Corp.,* 960 F.2d 1465, 1475

(9th Cir.1992). Specifically, it "asks whether the ordinary reasonable person would find the total concept and feel of the works to be substantially similar." *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir.1991) (internal quotations omitted).

97. In the instant case, analytic dissection and expert testimony clearly demonstrate that any and all similarities in expression between the Wong and Hon plumeria designs arise from the common usage of unprotected elements—i.e., the number of petals, the "pinwheel" arrangement, the types of finishes and rendering material, and the overall size, color, and texture of the pieces. Comparing the protected elements of petal shape, arrangement of blossoms/flourishes and the specific "grade" of the sand-blasting, the Court finds that the Cosmos and Hon pieces are not similar. Thus, Cosmos has failed to satisfy the "extrinsic" test. *Accord Idema v. Dreamworks, Inc.*, 162 F.Supp.2d 1129, 1178 (C.D.Cal.2001) (noting that " 'analytic dissection' requires breaking each work covered by copyright down into its constituent elements, and comparing only those 'elements' for proof of copying as measured by 'substantial similarity.' "); *see also Swirsky*, 376 F.3d at 845 ("Because the requirement [under the extrinsic test] is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work.").

98. Even if the Court were to find that the Cosmos and Hon designs share a similarity of ideas and expressions under the extrinsic test, Cosmos' copyright claim would still fail due a lack of similarity under the intrinsic test.

99. Where, as in this case, there are few protectable elements in the work under consideration, a finding that the work is entitled to only "thin" copyright under the intrinsic test is appropriate. *See, e.g.,Apple Computer v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir.1994). When a work is entitled to only "thin" copyright protection the intrinsic test must be performed using a "virtual identity" rather than a "substantial similarity" standard. *Id.* ("When the range of protectable expression is narrow, the appropriate standard for illicit copying is virtual identity."); *see also Satava*, 323 F.3d at 812 ("Satava possesses a thin copyright that protects against only virtually identical copying."); *cf. Aliotti*, 831 F.2d at 901 ("No substantial similarity may be found under the intrinsic test where analytic dissection demonstrates that all similarities in expression arise from the use of common ideas."); *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 741 (9th Cir. 1971) ("Any inference of copying based upon similar appearance lost much of its strength because both pins were lifelike representations of a natural creature.").

100. Upon comparison of the numerous photographs submitted into evidence, as well as the actual, *physical* jewelry pieces, the Court can readily distinguish between the Cosmos and Hon designs. Thus, it cannot conclude that the ordinary reasonable person would find them to be "virtually identical." Accordingly, the Hon designs do not infringe the Cosmos designs under the intrinsic test.

### B. Independent Creation

101. Because Cosmos has failed to make a showing of "virtual identity" under the intrinsic test, the Court need not entertain the evidence concerning Defendant Hon's "independent" artistic inspiration in creating his plumeria pieces. *Cf. Three Boys Music Corp.*, 212 F.3d at 486 ("By establishing reasonable access and substantial similarity, a copyright plaintiff creates a presumption of copying. The bur-

den shifts to the defendant to rebut that presumption through proof of independent creation.").

## II. Trade Dress Infringement

102. "Trade dress refers generally to the total image, design, and appearance of a product and 'may include features such as size, shape, color, color combinations, texture or graphics.'" *Clicks Billiards, Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir.2001) (quoting *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir.1993)).

■ 103. To sustain a claim for trade dress infringement, a plaintiff must prove: (1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion. *Id.*

### A. Nonfunctionality

■ 104. "A product feature [or trade dress] is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Mattel Inc. v. Walking Mt. Prods.*, 353 F.3d 792, 810 (9th Cir.2003); *see also Clicks Billiards*, 251 F.3d at 1257 ("A product feature is functional and cannot serve as a trademark if the product feature is essential to the use of purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage.") (citing *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)).

■ 105. In evaluating functionality, the Court should consider the following factors: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture. *Id.* (citing *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002 (9th Cir.1998)). However, the Court must not focus inordinately on individual design elements, but rather on "the overall visual impression that the combination and arrangement of those elements create." *Id.* at 1259. ("Trade dress is the composite tapestry of visual effects. Courts have repeatedly cautioned that, in trademark—and especially trade dress—cases, the mark must be examined as a whole, not by its individual constituent parts.").

■ 106. Applying these principles to the instant case, the Court concludes that Cosmos' trade dress—a line of gold plumeria jewelry that depicts the plumeria flower in yellow gold in a specific size and shape with a sand-blasted matte finish on the petals and high-polished shiny edges—is not functional. As established by the evidence and testimony, there are numerous "standard" materials and finishing techniques—alone or in combination—which a jeweler might employ to represent a plumeria flower. In addition, Cosmos' use of its particular design gives it only a subjectively aesthetic, rather than utilitarian, advantage with consumers. *See Clicks Billiards*, 251 F.3d at 1262 ("That the design decisions were made for aesthetic reasons—and not, for example, because they were the only, the cheapest, or the most efficient way to design a pool hall—is evidence of nonfunctionality.").

### B. Secondary Meaning

107. Cosmos concedes that its trade dress is not "inherently distinctive." However, it argues that it has acquired "secondary meaning."

108. Trade dress acquires secondary meaning when, "in the minds of the public, the primary significance of a product feature ... is to identify the source of the product rather than the product itself." *Qualitex*, 514 U.S. at 163, 115 S.Ct. 1300 (internal quotations omitted).

109. Factors courts consider in determining secondary meaning include: (1) whether actual purchasers associate the dress with the source; (2) the degree and manner of advertising by the party seeking protection; (3) the length and manner of use of the dress; and (4) whether the use by the party seeking protection has been exclusive. *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 517 (9th Cir.1989).

110. Based on these factors, the Court concludes that the trade dress of the Cosmos Plumeria Lei Series has secondary meaning. The jewelry has been in the marketplace for eleven (11) years and is prominently featured numerous stores throughout the Hawaiian Islands. In addition, the jewelry is heavily advertised in that geographical region and has won awards sponsored by local trade organizations. Moreover, when Cosmos advertises, it advertises the entire "line" of plumeria jewelry, not just single pieces.

111. Furthermore, unrefuted evidence establishes that jewelry store owners and customers alike associate the Plumeria Lei series and particular "signature" designs within the series with both Cosmos and Mr. Wong. This is strong proof of secondary meaning. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 296 (7th Cir.1998), *overruled on other grounds by TrafFix Devices v. Mktg. Displays*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) ("[W]here, as here, the relevant market includes both distributors and ultimate purchasers, the state of mind of the dealers is important in determining if secondary meaning exists.").

112. Finally, while there is no question that there are numerous jewelry manufacturers are engaged in the design and promotion of pieces purporting to represent the plumeria flower, there is no evidence that there was other jewelry on the market which employed the precise combination of design elements as the Wong/Cosmos pieces during the relevant time period.

## C. Likelihood of Consumer Confusion

113. "A likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *International Jensen v. Metrosound U.S.A.*, 4 F.3d 819, 825 (9th Cir.1993) (internal citations omitted); *see also Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir.1998) ("The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.").

114. In the Ninth Circuit, district courts are obliged to consider the following eight factors when evaluating likelihood of consumer confusion: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion. *Dreamwerks*, 142 F.3d at 1129.

115. Here, the balance of these factors weigh strongly in Cosmos' favor: (1) given the years of use and heavy promotion of its plumeria designs, Cosmos' mark is strong; (2) the parties' goods are highly related and sold in the same mar-

ket; (3) distributors of the goods have been actually confused between the competing designs; (4) the marketing channels—print media, in-flight magazines, in-store displays—are almost identical; (5) the goods are proximate in price range; and (6) the creation of additional pieces by either side will create more-not less-confusion. Thus, Court finds that there is a substantial likelihood of consumer confusion.

■ 116. Based on the foregoing, the Court concludes that Defendants are liable to Cosmos for trade dress infringement.

## III. Unfair Competition Under Cal. Bus. and Prof.Code § 17200

■ 117. Use of trade dress in a manner likely to confuse the public is a violation of Cal. Bus. and Prof.Code § 17200 et. seq. *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir.1988) ("The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived by the similarity of the marks.' "); *see also Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir.1991) ("[A]n action for unfair competition under Cal. Bus. and Prof.Code §§ 17200 is 'substantially congruent' to a trademark infringement claim under the Lanham Act … Under both, the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks.").

118. Accordingly, the Court concludes that because Cosmos prevails on its trade dress infringement claim, it must also prevail on its claim of unfair competition under Cal. Bus. & Prof.Code § 17200.

## IV. Relief

### A. Damages

■ 119. Under the Lanham Act, a trade dress infringement plaintiff is enti-tled to recover: (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a).

120. In establishing the defendant's profits, the plaintiff is required to present proof only of the defendant's gross revenues; the defendant is required to prove his or her deductible expenses and costs. *Id.*

121. In the instant case, the evidence shows that Defendant Hon was aware of the strength of Cosmos' trade dress and designed and marketed his plumeria jewelry to capitalize on this strength in a high-demand market. Thus, the Court concludes that an award of profits is appropriate.

122. Specifically, the Court concludes that the proper amount of damages in the form of defendant's profits is $2,341,526.52, which reflects the calculations made by Ms. Garcia based on the invoices and tax returns produced by Defendants.

■ 123. Punitive damages are not available under the Lanham Act, nor are they authorized under Cal. Bus. & Prof. Code § 17200. *See Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir.1996) ("[P]unitive damages are not available under the Lanham Act.") (internal citations omitted); *Wood v. Midland Credit Mgmt.*, 2005 WL 3159639, *5–6, 2005 U.S. Dist. LEXIS 31923, *15 (C.D.Cal.2005) ("Although damages may be an available form of remedy for common law unfair competition, neither nonrestitutionary nor punitive damages are an available form of remedy under California Business and Professions Code § 17200.") (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) ("Our previous cases discussing the UCL indicate our understanding that the Legislature did not intend to authorize courts to order monetary remedies other

**1088**

than restitution in an individual action.")) (additional citations omitted). Based on its review of the Complaint and Pre–Trial Conference Order, the Court finds that Plaintiff does not raise a claim for common law unfair competition in addition to its claims under the Lanham Act and Cal. Bus. & Prof.Code § 17200. Accordingly, the Court cannot award punitive damages in this case.

124. Cosmos has presented no evidence with respect to any other cognizable damages, such as damages for corrective advertising and/or reasonable royalties.

**B. Injunctive Relief**

125. Pursuant to 15 U.S.C. § 1116(a) and Cal. Bus. and Prof.Code § 17200 et. seq., Cosmos is entitled to a permanent injunction against Defendants to enjoin its use of the Plumeria Lei series' trade dress.

**C. Costs and Attorneys' Fees**

126. Under the Lanham Act, awards of attorneys' fees are appropriate in "exceptional" cases. *See* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorneys fees to the prevailing party.") The Ninth Circuit has found cases to be "exceptional" when the court finds "the defendant acted maliciously, fraudulently, deliberately, or willfully." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir.2003).

127. This Court found that the evidence "shows that Defendant ... was aware of the strength of [Plaintiff's] trade dress and designed and marketed his ... jewelry to capitalize on this strength in a high-demand market." *See* ¶ 121, *supra*. Defendants' awareness of the Plaintiff's market strength and subsequent exploitation of that strength represents a deliberate and willful use of the Plaintiff's tradedress, thus making this case "exceptional" under *Earthquake Sound Corp.* and 15 U.S.C. § 1117(a). As the prevailing party,

Cosmos is entitled to reasonable attorneys' fees and costs. *See* 15 U.S.C. § 1117(a).

**CONCLUSION**

Based on the foregoing, the Court finds that Defendants are liable to Plaintiff on Plaintiff's claims for trade dress infringement under the Lanham Act and unfair competition under Cal. Bus. & Prof.Code § 17200. The Court further finds that Plaintiff is entitled to total damages in the amount of $2,341,526.52, as well as permanent injunctive relief, along with costs and reasonable attorneys' fees.

To the extent that any findings of fact constitute conclusions of law they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

IT IS SO ORDERED.